# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BARRY BORUM,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:11-cv-997-AKK** |
| **WERNER CO., and LOWE'S** | ) | |
| **HOME CENTERS, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Before the court is Defendants Werner Co. (DE) and Lowe's Home Centers, Inc.'s ("Lowe's") (collectively "Defendants") motion to exclude the expert testimony of Dr. Houssam Toutanji ("Dr. Toutanji"), doc. 19, Werner Co. (DE)'s motion for summary judgment, doc. 20, Lowe's motion for summary judgment, doc. 21, Plaintiff Barry Borum's ("Borum") motion for leave to file an amended complaint, doc. 40, Defendants' joint motion to strike the affidavit of Borum, doc. 51, and Defendants' joint motion to strike the supplemental affidavit of Dr. Toutanji, doc. 52.  For the reasons stated more fully below, the motion to exclude the expert testimony of Dr. Toutanji is due to be **GRANTED**, Werner's motion for summary judgment is due to be **GRANTED**, Lowe's motion for summary judgment is due to be **GRANTED**, Borum's motion for leave to file an amended complaint is due to be **DENIED**, and the Defendants' motions to strike are due to

be **GRANTED in part** and **DENIED in part**.  Accordingly, consistent with this memorandum opinion, the court will enter a separate order dismissing this case.

## I.   FACTUAL AND PROCEDURAL HISTORY

This action arises from a February 15, 2009 accident where Borum fell off a ladder and suffered serious bodily injury.  *See* doc. 1-1, at 6.  In 1997, shortly after moving to Cullman, Alabama and buying a house, Borum allegedly purchased the ladder at issue, a Model 7410 Type IA fiberglass ladder manufactured in November 1986 by R.D. Werner Co., Inc, *see* doc. 1-1, at 4; doc. 20-2, at 4; doc. 48-5, at 11, from a Lowe's located in Cullman, doc. 21-3, at 15; doc. 48-6, at 2. Prior to the incident here, Borum used the ladder approximately twelve times a year and stored it in his basement or sun room.  Doc. 21-3, at 16; doc. 48-6, at 7.

On the day of the incident, Borum transported the ladder to a rented warehouse in order to install a two-post asymmetrical car lift that he planned to use for antique car restoration.  Doc. 21-3, at 18.  Around 1:00 p.m., Borum climbed the ladder approximately six feet to insert a quarter-inch nut and bolt above his head.  Doc. 21-3, at 17, 32; doc. 48-6, at 8.  The ladder then "shot across the room," and Borum fell forward to the ground.  Doc. 21-3, at 33.  Borum "vaguely remember[s] being tangled up in the ladder with [his] legs . . . when [he] woke up."  *Id.* at 34.  After losing and regaining consciousness, Borum eventually called 911.  Due to the severity of his injuries, the emergency responders decided to transport Borum to a trauma intensive care unit at the University of Alabama at Birmingham hospital.  *Id.* at 34-36.

As it relates to the ladder's manufacturer, R.D. Werner Co., Inc. changed its name to Werner Co. in 1994. Doc. 47-6, at 39; doc. 48-5, at 4. In 2006, Werner Holding Co. (DE), Inc., Werner Holding Co. (PA), Inc., Werner Co., and WIP Technologies, Inc. filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 06-10578 (KJC). *See* doc. 20-4; doc. 47, at 5-6; doc. 48-5, at 4. Moreover, on April 25, 2007, the Bankruptcy Court approved the sale of these debtors' assets to New Werner Holdings Co. (DE), LLC. Doc. 20-4, at 2. This "Approved Sale Order" discussed the "New" Werner Co.'s purchase of the "Old" Werner Co.'s assets and liabilities, and specifically required the "New" Werner Co. to fulfill all obligations arising under sales agreements with Lowe's Companies, Inc. and its subsidiaries. *See* doc. 20-4.

On February 15, 2011, Borum filed suit against Werner Co. (DE), a wholly owned subsidiary of the "New" Werner Co., doc. 3, at 1, Lowe's Home Centers, Inc., a wholly owned subsidiary of Lowe's Companies, Inc., doc. 2, at 1, and unnamed fictitious parties in the Circuit Court of Cullman County, Alabama. Doc. 1-1, at 3. Defendants timely removed to this court on March 17, 2011, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. Doc. 1. On April 25, 2011, this court entered a Scheduling Order that set an expert report deadline for Borum on August 1, 2011 and for Defendants on September 30, 2011. Doc. 9, at 3. The Scheduling Order also set deadlines of October 31, 2011 for any supplemental disclosures and discovery under Fed. R. Civ. P. 26(e), and November 30, 2011 for the completion

of all discovery.  *Id.* at 1, 3.  Moreover, the court allowed Borum until May 15,
2011 to join additional parties and to amend the pleadings.  *Id.* at 3.  Finally, the
court set a deadline of January 13, 2012 for dispositive motions.  *Id.* at 4.

Defendants submitted separate summary judgment motions on January 12,
2012, *see* doc. 20 (Werner Co.); doc. 21 (Lowe's), and filed a joint motion on the
same day to exclude the expert report and testimony of Borum's expert, Dr.
Toutanji, doc. 19.  In response, on January 13, 2012, Borum filed a motion to
amend and modify the court's April 25, 2011 Scheduling Order.  Doc. 22.  As
grounds for this motion, Borum stated that he needed to amend his original
complaint "for the purpose of conformity of the identity in addition of fictitious
parties without adding or substantially modifying existence[sic] claims contained
in the original Complaint."  *Id.* at 1-2.  Borum also sought a reopening of
discovery to depose experts, treating physicians, and corporate representatives and
to identify "indispensable party Defendants."  *Id.* at 3-7.  Although Borum filed
this motion almost 45 days after the discovery deadline, the court granted Borum's
motion but specifically stated "to the extent that Plaintiff seeks to amend to add
separate and unrelated corporate entities, the court will deny any motion Plaintiff
files to add such an entity or entities. However, to the extent Plaintiff is seeking to
amend to add the proper corporate entity of the current Defendants . . . the court
will consider such a motion."  Doc. 23, at 2.  Accordingly, the court reopened
discovery for this limited purpose until February 17, 2012, and also allowed
Borum until February 21, 2012 to seek leave to amend his original complaint.  *Id.*

at 3.  Borum timely moved to amend his complaint on February 21, 2012, doc. 40.

Moreover, after the court granted certain extensions, Borum responded to

Defendants' motions for summary judgment and motion to exclude the expert

testimony of Dr. Toutanji on March 20, 2012, docs. 47, 48, 49.  In support of these

opposition briefs, Borum submitted a personal affidavit and a supplemental expert

affidavit by Dr. Toutanji.  *See* doc. 48-3; doc. 48-6.  Defendants filed reply briefs,

docs. 53, 54, 55, and moved to strike Borum's affidavit and Dr. Toutanji's

supplemental report, docs. 51, 52.  All outstanding motions, s*ee* docs. 19, 20, 21,

40, 51, 52, are fully briefed, *see* docs. 42, 44, 47, 48, 49, 53, 54, 55, 56, 57, 58, 59,

60, and ripe for review.

## II.   STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary

judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  To

support a summary judgment motion, the parties must cite to "particular parts of

materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations, admissions, interrogatory

answers, or other materials."  Fed. R. Civ. P. 56(c).  Moreover, "Rule 56(c)

mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id*. at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## III.   ANALYSIS

### A.   Borum's Motion for Leave to File Amended Complaint

Before addressing the merits of Defendants' summary judgment motions,

the court must first discuss Borum's motion for leave to file an amended complaint.  Doc. 40.  Borum filed the motion after the expiration of various discovery deadlines and one day after Defendants timely filed their summary judgment motions.[1]  Doc. 22.  The court granted, in part, Borum's motion on January 18, 2012, and expressly ordered that "to the extent that Plaintiff seeks to amend to add separate and unrelated corporate entities, the court will deny any motion Plaintiff files to add such an entity or entities.  However, to the extent Plaintiff is seeking to amend to add the proper corporate entity of the current Defendants, . . . the court will consider such motion."  Doc. 23.  One February 21, 2012, Borum moved to amend his complaint for four primary reasons—(1) to change party name "Lowe's Home Centers, Inc." to "Lowe's Companies, Inc., a North Carolina Corporation and it's wholly owned subsidiaries," *see* doc. 1-1, at 3; doc. 40-1, at 1; (2) to change party name "Werner Co., a Delaware Corporation or Business Entity, being the Successor in interest of Werner Co., Inc., which was formerly a Pennsylvania Corporation; and with both previous entities being the Successors in interest of R.D. Werner Co., Inc." to "Werner Co. (D.E.) Inc., a Delaware Corporation, and being a wholly-owned subsidiary of New Werner Holding Company (D.E.) LLC, a Delaware Limited Liability Company in the Capacity of Indemnitor of Lowe's Companies, Inc. and Lowe's wholly owned subsidiaries," *id.*; (3) to add more specific factual allegations regarding the

---

[1] The court's original scheduling order allowed Borum until May 15, 2011 to join additional parties and to amend the pleadings.  Doc. 9, at 3.

negligent and wanton failure to warn claim, doc. 1-1, at 9; doc. 40-1, at 13-14; and (4) to add a "breach of implied warranty of merchantability" claim, doc. 1-1, at 10-11; doc. 40-1, at 16-18.  Each proposed amendment either fails to comport with the court's order entered on January 18, 2012, *see* doc. 23, or is untimely; as such, Borum's motion to amend is due to be **DENIED**.

  i.    *Indemnification by Werner Entity*

  Borum contends that, through reopened discovery, he found that the newly named "Werner entity assumed liability" of certain "bankrupted Werner entities to provide the Lowe's entity a warranty *to hold harmless and indemnify* Lowe's against any product defects and product liability claims."  Doc. 40, at 2 (emphasis added).[2]  As such, Borum attempts to amend his suit to allege claims against Werner Co. (D.E.) Inc., a wholly owned subsidiary of New Werner Holding Co. (D.E.) LLC, "in the *capacity of indemnitor* of Lowe's Companies, Inc. and Lowe's wholly owned subsidiaries."  *Id.* at 1 (emphasis added).  Moreover, in the proposed amended complaint, Borum alleges that, in June 2006, the manufacturer of the ladder in question—"R.D. Werner Co.," subsequently, "WERNER Co. ("PA) Inc.," and finally "Werner Company (DE) Inc."—filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware.  Doc. 40-1, at 3-4. The bankruptcy court approved an "Asset Purchase Agreement" whereby,

---

[2] The court also notes Borum's statement in opposition to Werner Co. (DE)'s motion for summary judgment that "Werner assumed any and all defense of Lowe's, pursuant to an Indemnification Agreement; and stands to assume liability for any and all money judgments rendered against Lowe's."  Doc. 47, at 3.

according to Borum:

> [T]he debtor's[sic] . . . sold all of its assets to a group of major creditors.  As part of the assets sold, or by Agreement, the buyer-creditors acquired the trade name of the debtors and are still commonly referred to as "Werner Co.'s."  To facilitate the Asset Purchase Agreement the buyer-creditors formed New Werner Holding Co. (DE), LLC, a Delaware limited liability company; and Werner, Co. (DE) Inc., became a wholly-owned subsidiary of New Werner Holding Co. (DE), LLC. . . .

> The Asset Purchase Agreement contained a provision whereby the buyer-creditors would assume certain obligations.  An obligation assumed, and specifically referenced in the order of the bankrupt[cy] court approving the Asset Purchase Agreement; and Assumption of Liabilities, was "Seller Agreements" existing between the seller-debtors (Werner Co.) and Lowe's Companies, Inc. and its wholly-owned subsidiaries.

> In 1996, Werner Co. entered into a Lowe's Master Standard Buying Agreement with Lowe's Company, Inc., requiring Werner to warrant any and all products it sold to Lowe's to be free from any and all defects; and *to hold harmless and indemnify* Lowe's against claims for personal injuries caused by defects, flaws, or failures in Werner products . . . .

*Id.* at 4-5 (emphasis added).

Stated simply, Borum's proposed amended complaint now solely seeks redress against the "proper" Werner entity as the *indemnitor* to the Lowe's entity—rather than any *direct* claim of liability against the Werner entity.[3]  *See*

---

[3] Werner Co. (DE) also asserts that "[t]here is no entity named 'Werner Co. (D.E.) Inc.[']', nor is there an entity 'New Werner Holding Company (D.E.) LLC,'" doc. 42, at 2; rather, the "proper" Werner entities are listed in the Initial Corporate Disclosures—Werner Co. (DE), a wholly owned subsidiary of New Werner Holding Co., Inc.  *Id.* (citing doc. 3, at 1).  The court finds it unnecessary to resolve this issue.  Borum attempts to amend the substantive nature of his

doc. 40-1, at 12, 16, 18; doc. 44, at 8-9.  *See also Stone Bldg. Co. v. Star Elec.*

*Contractors, Inc.*, 796 So. 2d 1076, 1090 (Ala. 2000) ("'Indemnity against losses

does not cover losses for which the indemnitee is not liable to a third person.'")

(quoting 41 Am. Jur. 2d *Indemnity* § 46 (1995)).  This proposed amendment

substantively alters Borum's claims against the "proper" Werner entity; and

therefore, goes well beyond merely adding "the proper corporate identity of the

current Defendants." *See* doc. 23, at 2.  *See also* doc. 1-1, at 7-12 (original

complaint alleging each claim jointly against all named Defendants).[4]

ii.   *Lowe's Home Centers, Inc.*

As it relates to the "proper" Lowe's corporate entity, Borum's proposed

─────────────

claims against the Werner entity; an untimely amendment.  *See* doc. 23.  Some Werner entity
may ultimately need to indemnity Lowe's—however, the proper Werner entity to do so is not a
question presently before this court.

[4] Moreover, the court has significant doubts that this "indemnification" theory of recovery
against the Werner entity is procedurally proper.  Without support in the Federal Rules of Civil
Procedure or relevant case law, Borum makes the conclusory statement that "a plaintiff with
knowledge of indemnity can likewise implead an indemnitor."  Doc. 40, at 2.  However, as it
relates to impleading third parties, Fed. R. Civ. P. 14(a) provides: "A *defending* party may, as
third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it
for all or part of the claim against it." *Id.* (emphasis added).  Furthermore, Fed. R. Civ. P.
14(b)—titled "[w]hen a plaintiff may bring in a third party"—states: "When *a claim is asserted
against a plaintiff*, the plaintiff may bring in a third party if this rule would allow a defendant to
do so." *Id.* (emphasis added).  Borum is neither a "defending party" nor is "a claim [] asserted
against Borum;" therefore, the Federal Rules of Procedure explicitly prohibit Borum from
impleading the Werner entity as the Lowe's indemnitor.  Lowe's may subsequently choose to
seek indemnification from a Werner entity; however, Borum cannot force Lowe's to do so.  And,
in that regard, Borum suffers no prejudice from this decision because indemnification from
Werner to Lowe's is only needed if Borum can recover from Lowe's.  Significantly, if Lowe's is
liable to Borum, it cannot avoid paying a judgment by claiming that Borum should have filed a
claim against the Lowe's indemnitor.

amendment seeks relief against "Lowe's Companies, Inc., a North Carolina Corporation and it's wholly owned subsidiaries."  Doc. 40-1, at 1.  However, "Lowe's Home Centers, Inc.," the original named defendant, is a wholly owned subsidiary of Lowe's Companies, Inc.  *See* doc. 2, at 1.  Moreover, Borum has known that Lowe's Companies, Inc. is the parent corporation since Lowe's Home Centers, Inc. filed its Corporate Disclosures on March 17, 2011.  *Id.*  Accordingly, the proposed amendment changing the Lowe's entity is untimely and fails to satisfy the criteria established in this court's January 18, 2012 order.  *See* doc. 23. Perhaps most importantly, Borum neglects to establish the need to include Lowe's Companies, Inc. and all other wholly owned subsidiaries in addition to Lowe's Home Centers, Inc.  In other words, as Lowe's Home Centers, Inc. *is* a wholly owned subsidiary of Lowe's Companies, Inc., Borum attempts to add *new party-defendants* rather than merely amend to name the proper corporate entity.

### iii.    Failure to Warn Claim

Borum's original complaint alleged a claim for negligent and wanton failure to warn, and, specifically, "Defendants . . . knew or should have known that the defective ladder could create danger when used in its customary manner. Defendants . . . owe a duty to exercise reasonable diligence to make such dangers known to persons likely to be injured by such products."  Doc. 1-1, at 9.  The proposed amended complaint provides more specific allegations regarding inadequate warnings for the fiberglass ladder's care, use, maintenance, transportation, storage, and durability limitation.  *See* doc. 40-1, at 12-16.

However, the original complaint adequately provided a short and plain statement of the facts regarding a negligent or wanton warning claim that encompassed the additional facts in the proposed amended complaint.  *See* Fed. R. Civ. P. 8(b).  Thus, in addressing the merits of Borum's negligent or wanton failure to warn claim, the court will consider the specific warnings asserted by Borum in his summary judgment briefing, *see* doc. 48, and, accordingly, the court finds no need for Borum to amend his original complaint on these grounds.

  iv. *Breach of Implied Warranty of Merchantability*

  Finally, Borum may not amend to assert an additional claim against Lowe's and Werner.  Borum contends that "[t]he amendment clarifies 'Claim Three' of the original complaint to make it clear this claim includes both of Alabama's Uniform Commercial Code implied warranties of goods sold, i.e. merchantability and fitness for a particular purpose.  Borum asserts this claim was poorly crafted in the original Complaint."  Doc. 40, at 3.  The court disagrees because the original complaint unambiguously alleged that Defendants breached the "implied warranty for fitness of a particular purpose" only.  *See* doc. 1-1, at 10.[5]  The implied

---

[5] Specifically, the original complaint states:

 Said Defendants . . . at the time of the sale of the defective ladder to Plaintiff, knew, or had reason to know, that Plaintiff was purchasing the ladder to perform tasks that could not be reached by Plaintiff from a ground level, and that this particular purpose would be performed by the end-use of the described ladder herein.

 Plaintiff, in purchasing the ladder, relied upon said Defendants' . . . skill or judgment to select or furnish suitable goods for the intended particular purpose.

warranty of merchantability is a separate and distinct claim from the implied warranty for fitness of a particular purpose.  *Compare* Ala. Code § 7-2-314 (implied warranty of merchantability) *with* Ala. Code § 7-2-315 (establishing that, unlike the warranty of merchantability, the implied warranty of fitness for a particular purpose also requires that the "seller at the time of contracting has reason to know any particular purpose for which the goods are required").  Thus, while a plaintiff *could* potentially bring both warranty claims where "the purpose for which the product is purchased is the same as the purpose for which it is generally sold," *Vinyard v. Duck*, 180 So. 2d 522, 524-25 (Ala. 1965); *Bagley v. Mazda Motor Corp.*, 864 So. 2d 301, 314-15 (Ala. 2003), here, Borum failed to timely do so.  Again, on April 25, 2011, this court entered a scheduling order whereby "Plaintiff is allowed until May 15, 2011, to join additional parties and to amend pleadings."  Doc. 9, at 3.  The court then extended this amendment deadline to allow Borum the opportunity to "add the proper corporate entity of the current Defendants."  Doc. 23.  On the other hand, nothing prevented Borum from amending his complaint to add an implied warranty of merchantability claim against Defendants before the expiration of the original May 15, 2011 amendment deadline.  And indeed, Borum offers no explanation as to why he waited over nine months to raise this issue.

---

Doc. 1-1, at 10-11.

In sum, Borum's proposed amendments are either untimely or unnecessary, and accordingly, the court **DENIES** the motion to amend.

## B.  Werner Co. (DE)'s Motion for Summary Judgment

Borum asserts three claims against Werner Co. (DE)—(1) design defect under the Alabama Extended Manufacturers' Liability Doctrine ("AEMLD"); (2) negligent and wanton failure to warn; and (3) breach of the implied warranty for fitness of a particular purpose.  *See* doc. 1-1.  However, for the reasons stated below, each claim fails because Werner Co. (DE) never sold the ladder at issue.

It is undisputed that the ladder at issue is a Model 7410 Type IA fiberglass ladder manufactured in November 1986 by R.D. Werner Co., Inc, *see* doc. 1-1, at 4; doc. 20-2, at 4; doc. 48-5, at 11, and that, in 1994, R.D. Werner Co., Inc. changed its name to Werner Co., doc. 47-6, at 39; doc. 48-5, at 4.  It is also undisputed that, in 2006, Werner Holding Co. (DE), Inc., Werner Holding Co. (PA), Inc., Werner Co.—also referred to as "Old" Werner Co. or "Old Ladder Co."[6]—and WIP Technologies, Inc. (collectively "Debtors") filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 06-10578 (KJC).  *See* doc. 20-4; doc. 47, at 5-6; doc. 48-5, at 4.  Moreover, on April 25, 2007, the Bankruptcy Court approved the sale of Debtors' assets to New Werner Holdings Co. (DE), LLC ("Buyer").  Doc. 20-4, at 2.  The

---

[6] Werner Co. (DE) provides that "[d]uring the course of the bankruptcy proceedings, the "Old" Werner Co. changed its official name to the Old Ladder Co. in order to eliminate any confusion during the expected liquidation of the company's assets, including its trade name." Doc. 20-2, at 3.

Bankruptcy Court's "Sale Order" explicitly provided that:

> Buyer is not assuming nor shall it or any affiliate of Buyer be in any way liable or responsible, as a successor or otherwise, for . . . any liabilities calculable by reference to the Debtors or their operations of the Purchased Assets or relating to continuing or other conditions existing in or prior to the Closing Date, which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against Buyer or any affiliate of they Buyer.

Doc. 20-4, at 13-14. The Sale Order also stated, "Upon Closing the Sale, all creditors, employees and equityholders of the Debtors are permanently and forever barred, restrained and enjoined from . . . (b) asserting any claims or enforcing remedies under any theory of successor liability, *de facto* merger, substantial continuity or similar theory." *Id.* at 20.[7] Moreover, the March 20, 2007 "Asset Purchase Agreement" between Werner Holding Co. (DE), Inc. (and its affiliates) and New Werner Holding Co. (DE), LLC similarly provided in the "Customer Product Liability" section that "Buyer will assume any Liability of Sellers to any customer of any Seller that is not listed on Schedule 2.3(d) [Lowe's Companies,

---

[7] Borum correctly points out that the Bankruptcy Court's Sale Order also contains a provision stating, "For the avoidance of doubt, upon the assignment of the Lowe's Agreements to the Buyer, the Buyer will be required to perform all obligations under the Lowe's Agreements, including, but not limited to, the provision of any customer programs or indemnity obligations, if such obligations are set forth in or arise out of the Lowe's Agreements." Doc. 20-4, at 16. Assuming, without deciding, that the "New" Werner Co. assumed the preexisting indemnity obligations to Lowe's Companies, Inc. and its subsidiaries, the "New" Werner Co. is only liable *to Lowe's* to the extent that a third party recovers against Lowe's in accordance with the provisions of the indemnity agreement. *See supra.* Moreover, there is some dispute regarding the proper name of this "New" Werner Co. entity that "assumed" these indemnity obligations to Lowe's. *See* doc. 47, at 4; doc. 44; doc. 42. Resolution of this issue is not necessary in resolving the current dispute before the court.

Inc. not listed on this Schedule], but only to the extent that such Liability is or becomes an allowed administrative expense claim of Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code." Doc. 48-8, at 4. There is no evidence or assertion that Borum's product liability claims against Werner Co. (DE), a wholly owned subsidiary of the "New" Werner Co., *see* doc. 3, at 1, are allowed administrative expense claims of the bankrupt "Old" Werner Co. *See* 11 U.S.C. § 503(b).

Thus, as "Old" Werner Co. manufactured and sold the ladder here, and Werner Co. (DE) assumed no liability as a wholly owned subsidiary of the successor company New Werner Holding Co. (DE), LLC, Borum's claims fail as a matter of law. Liability for design defect under the AEMLD requires a plaintiff to prove "'[1] that an injury was caused by one who sold a product in a defective condition that made the product unreasonably dangerous to the ultimate user or consumer; [2] that the seller was engaged in the business of selling such a product; and [3] that the product was expected to, and did, reach the user without substantial change in the condition in which it was sold.'" *Tillman v. R.J. Reynolds Tobacco Co.*, 871 So. 2d 28, 31 (Ala. 2003) (quoting *Bell v. T.R. Miller Mill Co.*, 768 So. 2d 957 (Ala. 2000) (alterations in original)). *See also Turner v. Azalea Box Co.*, 508 So. 2d 253, 254 (Ala. 1987). Borum fails to demonstrate that Werner Co. (DE) sold the ladder in question or retains any successor liability for "Old" Werner Co., the entity that purportedly manufactured and sold the ladder. Therefore, summary judgment is warranted on this claim. *See Celotex*, 477 U.S. at

322 (summary judgment warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Similarly, under Alabama law, a plaintiff may only assert a failure to warn claim against "'one who supplies directly or through a third person a chattel for another to use . . . .'" *Abney v. Crosman Corp.*, 919 So. 2d 289, 293 (Ala. 2005) (quoting Restatement (Second) of Torts § 388 (1965) and providing that the Alabama Supreme Court has adopted this language from the Restatement). The "Old" Werner Co.—as opposed to Werner Co. (DE)—manufactured and supplied the ladder here, and Werner Co. (DE) retains no successor liability for claims against "Old" Werner Co. *See* doc. 20-4. Therefore, summary judgment is also warranted on the failure to warn claim.

Finally, to prevail on a claim for breach of the implied warranty for fitness of a particular purpose, plaintiff must establish that "the seller at the time of contracting ha[d] reason to know any particular purpose for which the goods are required and that the buyer [relied] on the seller's skill or judgment to select or furnish suitable goods . . . ." Ala. Code § 7-2-315. *See also Gordon v. Pfizer, Inc.*, No. CV-06-RRA-703-E, 2006 WL 2337002, at *8 (N.D. Ala. May 22, 2006) (holding that plaintiff "cannot maintain an action for breach of warranty against Pollard who . . . is not a seller and thus, cannot be liable as a warrantor of a product"). Again, there is no evidence that Werner Co. (DE) sold the ladder here, and Werner Co. (DE) faces no successor liability if "Old" Werner Co. had

breached the implied warranty for fitness of a particular purpose—an accusation for which the court finds no evidentiary support.  Accordingly, this claim also fails.

In opposition, Borum maintains that the "Hold Harmless & Indemnity Policy . . . coupled with Paragraph 15 of the Order of the Bankruptcy Court . . . clearly shows Werner is not entitled to summary judgment because it is the specific indemnitor of Lowe's, of any claims, damages, liabilities or suits for personal injury or death caused by defects, flaws or failures in Werner's products." Doc. 47, at 8.  *See also* doc. 20-4; doc. 47-3, at 18.  However, the court agrees with Werner Co. (DE) that the "agreement to indemnity is not relevant" for purposes of this summary judgment motion.  Doc. 55, at 3.  Thus, to reiterate, any potential indemnification from a "New" Werner Co. entity to a Lowe's entity presupposes Lowe's liability to Borum.  Furthermore, Lowe's maintains the right to indemnification, not Borum.  *See supra*.  Accordingly, the court next addresses the merits of Borum's claims against Lowe's.

## C.    Lowe's Home Centers, Inc.'s Motion for Summary Judgment

Before addressing each specific claim, the court must analyze Lowe's overarching contention that "Borum fails to prove he purchased the ladder from Lowe's."  Doc. 21-1, at 2.  Borum testified that, in 1997, he purchased the ladder in question from a Lowe's store located in Cullman, Alabama.  Doc. 21-3, at 15. More specifically, Borum provided:

**Q.** Where did you buy the ladder?

**A.** I bought it when I moved here from Lowe's.

**Q.** And when was that?

**A.** '97

**Q.** Okay.  And which Lowe's did you buy it at?

**A.** I think -- there's one here in Cullman.  That would be the one.

**Q.** Okay.

**A.** As far as I recall.

**Q.** All right.

**A.** I don't --

**Q.** Do you have any --

**A.** I don't know why I'd go anywhere else.

**Q.** Well, I mean --

**A.** I don't know why I'd go anywhere but Lowe's to buy it because that's the only place I remember that was here that sold ladders.

*Id.*  In opposition to summary judgment, Borum also submitted an affidavit stating

that:

> After twelve years from the time I bought it (ladder) I searched but could not locate a sales receipt or credit card receipt.  I could not remember the exact date or month I bought it, but I know it was 1 1/2 to 2 years after I bought the house in April of 1995.  I went to Lowe's because I know they regularly sell new ladders to homeowners and contractors.  The selection for a buyer is great at Lowe's.  I cannot remember the specific amount I paid for it, but I know it was over a hundred dollars.  I just cannot remember the specifics.  I am certain I bought the ladder in Cullman to do the work and the only place I have

bought a ladder in Cullman is at Lowe's.

Doc. 48-6, at 3.[8]

Conversely, Lowe's submitted an affidavit of Dale King ("King"), the

Werner Co. (DE) corporate representative, stating that:

> This model [7410 Type IA] is a ladder that is considered to be a
> heavy duty ladder and one that was not typically stocked by retailers
> such as Lowe's, Inc., but most commonly was an item that had to be
> ordered specially . . . . A search of the available records of "Old
> Ladder Co." for the time period at issue reveal that only one ladder of
> this type, Model 7410, was the subject of a special order and that was
> a special order by Cullman High School and was made through the
> retailer Sears, Roebuck & Co.

Doc. 21-4, at 3.  Moreover, King testified, as it relates to this search, that "[t]here

was a computer search that was done at my request . . . . I requested any special

order 7410s that were sent to Alabama for the years 1996 to 1999 and this [the

Cullman High School order] is the only one that showed up."  Doc. 48-5, at 27.

---

[8] As it relates to this portion of Borum's affidavit, Lowe's motion to strike the testimony as a "sham" is due to be **DENIED**.  *See* doc. 51.  "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins and Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984); *see also Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) ("Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all . . . . [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence.") (alteration in original, citation omitted).  Put simply, the court finds Borum's deposition testimony and affidavit testimony sufficiently consistent—he thinks he purchased the ladder at Lowe's.

Furthermore, King provides:

> **Q.** But you're making a supposition that [the Borum ladder is] a custom order; aren't you?
>
> **A.** Well, I have to because I know it's not a stocked item for Lowe's.
>
> **Q.** How do you know that?
>
> **A.** Because I worked with Lowe's in that time frame.  That's not part of their product mix . . . . Lowe's carried a 200 pound ten-foot fiberglass ladder called an FIA 10.  And that was what was part of Lowe's product mix.  The 7410 would not have been part of their product mix so for them to get it it would have had to have been a custom order.

*Id.*  Finally, King expresses doubt that Borum purchased the 1986 manufactured ladder new in 1997—"I don't think it was sold as a new ladder at that point . . . . [W]hen I hear the testimony of Mr. Borum and he basically says the ladder was just stored at his house.  And when I take a look at the ladder and I see how much transit damage, it sure looks like it was used as a commercial ladder for a long period of time."  *Id.* at 65.

Both parties agree that, for Borum to prevail against Lowe's, he must prove by a preponderance of the evidence that he purchased the ladder in question from Lowe's.  *See* doc. 21-1, at 7; doc. 48, at 15.  *See also Turner*, 508 So. 2d at 254 ("In an AEMLD action, the plaintiff must prove that the defendant manufactured and/or sold the allegedly defective product."); *Abney*, 919 So. 2d at 293 (liability for a failure to warn claim limited to those who "suppl[y] [chattel] directly or through a third person"); Ala. Code § 7-2-315 (implied warranty applies only to

"seller" of goods).  Generally, "'evidence which affords nothing more than mere speculation, conjecture, or guess is wholly insufficient to warrant submission of the case to the jury.'" *Turner*, 508 So. 2d at 254 (quoting *Roberts v. Carroll*, 377 So. 2d 944, 946 (Ala. 1979)).  *See also Lee v. Celotex Corp.*, 764 F.2d 1489, 1492 (11th Cir. 1985).  In other words, while "[a]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant . . . an inference based on speculation and conjecture is not reasonable."  *Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988).

Here, Borum testified, with personal knowledge, that he purchased the Werner ladder from Lowe's, but Borum offers no documentation or other evidence supporting this claim.  Similarly, Lowe's offers the testimony of Werner Co. (DE)'s corporate representative that, in 1997, when Borum purportedly purchased the ladder, the 7410 Type IA Werner model "is a ladder that is considered to be a heavy duty ladder and one that *was not typically* stocked by retailers such as Lowe's, Inc., but *most commonly* was an item that had to be ordered specially." Doc. 21-4, at 3 (emphasis added).  The Werner Co. (DE) representative clarified at deposition that, in 1997, the 7410 model was, unequivocally, not part of Lowe's "product mix."  Doc. 48-5, at 27.  However, Lowe's also offers no documentation or other evidence supporting this assertion made by Werner Co. (DE)'s representative—as opposed to its own corporate representative.  Accordingly, the court is left with conflicting testimony by two witnesses claiming personal knowledge of the facts at issue.  Therefore, although the objective evidence

weighs heavily against Borum's assertion that he purchased a ladder manufactured in 1986 "new" in 1997 from Lowe's, taking this testimonial evidence in the light most favorable to Borum, the court finds that Borum's deposition and affidavit testimony sufficiently prevents summary judgment on these grounds. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[P]urpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.") (quotation marks and citation omitted); *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) ("Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact").[9]  As the court **DENIES** Lowe's summary judgment motion on these grounds, it must now address each specific claim alleged against Lowe's.

### i.    AEMLD Design Defect

As previously stated, "[t]o establish liability under the AEMLD, a plaintiff

---

[9] Indeed, the court also finds the Eleventh Circuit asbestos exposure cases instructive. *See, e.g.*, *Lee v. Celotex Corp.*, 764 F.2d 1489 (11th Cir. 1985); *Tippens v. Celotex*, 805 F.2d 949 (11th Cir. 1986).  In these cases, the court focused on whether plaintiff presented sufficient evidence, to survive summary judgment, of exposure to the specific defendant's asbestos containing product.  With regard to satisfying this standard, plaintiff "recalled specifically the names of the products, their descriptions, the job sites where he used them, and the procedure for applying these products." *Lee*, 764 F.2d at 1491.  Conversely, the court granted summary judgment where plaintiff "failed to show that the asbestos-containing joint treatment products manufactured by National Gypsum were or could have been used in the manner [plaintiff] testified that he used 'Gold Bond cement.'" *Id.* at 1492.  Here, Borum specifically testified that he purchased the ladder from a Lowe's in Cullman, Alabama and why he went to Lowe's for the ladder.  Although there is some evidence to the contrary, the court cannot determine, based on this evidence at the summary judgment phase, that Borum's testimony is implausible or unreasonable.

must show '[1] that an injury was caused by one who sold a product in a defective condition that made the product *unreasonably dangerous* to the ultimate user or consumer; [2] that the seller was engaged in the business of selling such a product; and [3] that the product was expected to, and did, reach the user without substantial change in the condition in which it was sold.'" *Tillman*, 871 So. 2d at 31 (quoting *Bell v. T.R. Miller Mill Co.*, 768 So. 2d 953, 957 (Ala. 2000) (alteration and emphasis in original)).  Moreover, where, as here, the plaintiff alleges a design defect under the AEMLD, *see* doc. 1-1, at 7-8, the plaintiff must also prove that:

> A safer, practical, alternative design was available to the manufacturer at the time it manufactured the [product].  The existence of a safer, practical, alternative design must be proved by showing that:
>
> (a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that
>
> (b) taking into consideration such factors as the intended use of the [product], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used.

*Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839, 858 (Ala. 2002) (alterations in original, quotation marks and citations omitted).  As Borum relies on the expert testimony of Dr. Toutanji to support his AEMLD claim, the court

must consider Defendants' *Daubert* motion to exclude Dr. Toutanji's expert testimony, doc. 19, and Defendants' motion to strike Dr. Toutanji's supplemental affidavit submitted in opposition to summary judgment, doc. 52.  For the reasons stated below, the court **GRANTS** both the motion to exclude and the motion to strike, and, as a result, will also **GRANT** Lowe's motion for summary judgment on the AEMLD claim.

In April 2011, Borum produced Dr. Toutanji's expert report, *see* doc. 19-1, which generally concluded that:

> [The ladder's] failure was due to the combination of tensile and compression forces, which caused buckling/bending.  At about one foot from the ground, the failure started due to an inward twisting load.  This combination of these forces caused the distortion of the frame in the out-of-plane direction inducing bending at the bottom part of the beam leg.  The bending in the member exceeded the maximum bending strength of the GFRP [glass fiber reinforced polymer] beam.  The bending stresses are usually resisted by bracing members . . . This failure could have been prevented by employing a lateral bracing at the bottom of the ladder.

*Id.* at 7-8.  On January 12, 2012, Defendants moved to exclude Dr. Toutanji's testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), arguing that Dr. Toutanji's opinions and conclusions "are not based 'in appropriate scientific method or fact' and are due to be excluded as unreliable.  He presents nothing more than unsupported, conclusory statements and speculation." Doc. 19.

In response to Defendants' *Daubert* motion and in opposition to summary

judgment, on March 20, 2012, Borum offered an affidavit by Dr. Toutanji.  Doc.
48-3.  This affidavit provided "supplemental opinions, conclusions; and rebuttal."
*Id.* at 9.  Namely, (1) the ladder at issue failed to meet the applicable American
National Standards Institute's Safety Requirements for Portable Reinforced Plastic
Ladders ("ANSI 14.5"), *id.* at 10; (2) there is no validity to any testing performed
by a Warner entity and the professional and engineering opinion of Werner Co.
(DE) representative Dale King is unreliable, *id.* at 12-18; (3) the ladder contained
no design feature or testing to prevent "creep-rupture"—defined as an "endurance
time frame" for products that undergo stress such as the frequent loading and
unloading on a ladder, *id.* 9, 18; (4) the ladder "should have contained warnings it
had not been tested for stress and twisting and turning within the ladder frame
should be avoided; that fiberglass, subjected to loading and unloading, over time,
can suddenly fail; and that the ladder should never be exposed to high humidity or
sunlight for extended periods of time," *id.* at 19-20; and (5) "Werner had the
manpower, resources and knowledge to design its fiberglass ladders with a lateral
brace, and should have done this to correct the design following the failed cyclic
horizontal test," *id.* at 20.  Dr. Toutanji's affidavit also rebutted the expert report
offered by King.  *Id.* at 23.

On April 3, 2012, Defendants moved to strike Dr. Toutanji's supplemental
affidavit because it "amounts to nothing more than an additional attempt to
manipulate this Court's Scheduling Order and 'backdoor' new opinions and other
elements of a proper expert disclosure."  Doc. 52.  The court agrees that Dr.

Toutanji's affidavit constitutes an untimely, and therefore, improper supplemental expert report.  Accordingly, the court **GRANTS** Defendants' motion to strike this affidavit.  The court entered a Scheduling Order on April 25, 2011, setting a deadline of August 1, 2011 for Borum's expert reports and November 30, 2011, for the close of all discovery.  Doc. 9, at 2.  After Defendants moved for summary judgment and to exclude the expert testimony of Dr. Toutanji, on January 13, 2012, well after the discovery period ended, Borum moved to reopen discovery to identify fictitious and indispensable party Defendants, depose experts and corporate representatives, and depose treating physicians.  Doc. 22.  The court granted the motion, and reopened discovery until February 17, 2012 for the specific purposes stated in Borum's motion.  Critically, Borum failed to seek leave from the court for submission of a supplemental expert report that offered additional theories of liability against Defendants.  In addition, the court agrees with Defendants that, even if the reopening of discovery until February 17, 2012 included the option to submit supplemental expert reports, Borum failed to provide this supplemental report to Defendants prior to the February 17, 2012 deadline.  *See* doc. 60, at 4.  As such, Borum may not now rely on this subsequent expert report to defeat summary judgment.[10]

---

[10] In opposition to the motion to strike, Borum maintains that the parties stipulated that "Defendant's expert report could be delivered when written discovery was due; and Plaintiff's expert could submit a supplemental report following receipt of Defendant's report so that Plaintiff would have a final initial report."  Doc. 58, at 3.  The parties never presented this stipulation to the court.  Moreover, Defendants provided Borum with Dale King's expert report on November 18, 2011, *see* doc. 58, at 4; doc. 48-12, as such, nothing prevented Borum from

Furthermore, the court agrees with Defendants that a *Daubert* analysis requires the exclusion of Dr. Toutanji's *original* expert report, and therefore, this motion is also **GRANTED**.  *See* doc. 19-1.  The Eleventh Circuit instructs that, in determining the admissibility of expert testimony, the court must "engage in a rigorous three-part inquiry," considering whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [ *v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (citations omitted, alteration in original).  It is not this court's role "'to make ultimate conclusions as to the persuasiveness of the proffered evidence,'" *id.* (quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)); rather, "'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are [generally] the traditional and appropriate means of attacking shaky but admissible evidence,'" *id.* (quoting *Quiet Tech.*, 326 F.3d at 1341).  Accordingly, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594-95.  On the other hand, "nothing in either

---

seeking leave to file a supplemental expert report prior to the close of discovery.

*Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion offered."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Defendants argue that Dr. Toutanji's conclusions are unreliable and fail to assist the trier of fact because they "are not based on the particular facts of the case at bar . . . [in that] [h]e fails to consider the undisputed evidence that the Plaintiff landed on top of the ladder as a result of his fall and became entangled in the legs of the ladder."  Doc. 19, at 10.  Thus, Defendants contend, Dr. Toutanji assumes that the 7 inch crack in the bottom of the ladder caused the fall, as opposed to Borum's fall causing the crack.  *Id.* at 10-11 (citing *Verchot v. General Motors Corp.*, 812 So. 2d 296, 303 (Ala. 2001)).  Defendants also argue that Dr. Toutanji fails to properly "explain his methodology with respect to his theory that the ladder was defectively designed"—more specifically, Dr. Toutanji neglects to account for industry standards, why additional bracing is recommended, the feasibility of his proposed alternative design, and testing for the alternative design. *Id.* at 11-12.

In his report, Dr. Toutanji analyzed the stress or force exerted on Borum's ladder based on Borum's size and purported movement, stress tested a specimen of the ladder using the "MTS Insight Electromechanical compression/tension machine," and concluded that the combination of these forces "caused

buckling/bending." Doc. 19-1, at 5-7. In other words, "[t]his combination of these forces caused the distortion of the frame in the out-of-plane direction inducing bending at the bottom part of the beam leg. The bending in the member exceeded the maximum bending strength of the GFRP beam." *Id.* at 7. Finally, Dr. Toutanji provides that "[t]his failure could have been prevented by employing a lateral bracing at the bottom of the ladder." *Id.* at 8.

Dr. Toutanji's "Discussion" relies on significant assumptions for which he offers insufficient support to demonstrate reliable methodology. For example, Dr. Toutanji concludes that the ladder failed "due to the combination of tensile and compression forces, which caused buckling/bending. At about one foot from the ground, the failure started due to an inward twisting load." Doc. 19-1, at 7. However, Dr. Toutanji fails to define or even discuss the cause of this "inward twisting load," or, perhaps more importantly, the force exerted by the "inward twisting load." In short, Dr. Toutanji assumes away the initial causal factor of the ladder's failure. Such omission renders the expert report unreliable. Similarly, the court agrees with Defendants that Dr. Toutanji neglects to account for other possible, if not probable, causes of the ladder's failure. *See* doc. 19, at 11. Namely, Dr. Toutanji provided that "[a] big crack (7 inches) was observed on the left leg of the ladder at the very bottom." Doc. 19-1, at 4. However, Dr. Toutanji fails to even consider whether the crack pre-existed the accident. *See Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999) for proposition that "an

expert must provide some explanation of why other potential causes were not the sole cause"). Accordingly, the court finds that this "analytical gap" regarding causation of the ladder's failure warrants exclusion of Dr. Toutanji's conclusions. *See* doc. 19, at 11. As the gatekeeper of expert testimony, the court refuses to allow Dr. Toutanji to proceed on his theory that the ladder failed due to some specific combination of forces when the analysis never actually defines one of these forces and neglects to account for any other potential alternative causes of structural failure.

Moreover, Dr. Toutanji offers no support, analysis, or testing regarding his reasonable alternative design. The AEMLD requires that plaintiffs prove a safer alternative design to succeed on a design defect theory of liability. *See Hannah*, 840 So. 2d at 858. Here, Dr. Toutanji merely states that the ladder's failure "could have been prevented by employing a lateral bracing at the bottom of the ladder." Doc. 19-1, at 8. Without more analysis regarding his engineering methodology, the court may not blindly accept Dr. Toutanji's conclusions. Indeed, the court finds *Slay v. Keller Indus., Inc.*, 823 So. 2d 623 (Ala. 2001), instructive on this point. In *Slay*, plaintiff submitted expert testimony "suggest[ing] certain design changes that [the expert] believed could improve the ladder." *Id.* at 624. The purported expert "offered no test results or factual information to support his belief that the ladder was 'underdesigned,' though he suggests the rather obvious conclusion that the ladder would have been stronger if it had been constructed with a thicker-gauge aluminum." *Id.* at 625. As such, the court excluded the

expert's testimony under *Daubert* and *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), because "[m]ere assertions of belief, without any supporting research, testing, or experiments, cannot qualify as proper expert scientific testimony." *Id.* at 626 (noting that Alabama still follows the "general-acceptance" test for expert witnesses enunciated in *Frye*, but ultimately analyzing the expert's admissibility under both *Daubert* and *Frye*). Put differently, "[t]he problem with the methods and procedures behind [the expert's reasonable alternative design] is that, as far as the court can detect, there were no methods or procedures employed." *McCreless v. Global Upholstery Co., Inc.*, 500 F. Supp. 2d 1350, 1357 (N.D. Ala. 2007).

In addition, "[a]lthough testing is not always a prerequisite to reliability, an expert who conducts no testing must be prepared with '"a good explanation as to why his or her conclusion remained reliable" notwithstanding the absence of testing.'" *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 588-89 (N.D. Fla. 2009) (quoting *Bauer v. Bayer A.G.*, 564 F. Supp. 2d 365, 379 (M.D. Pa. 2008) (quoting *In Re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 760 (3d Cir. 1994))). Here, lateral bracing *may* have strengthened the ladder, but Dr. Toutanji's expert report provides no reliable methodology for concluding that additional lateral bracing would have prevented or lessened Borum's injuries; much less that the ladder, absent the lateral bracing, was "unreasonably dangerous" for its intended use. *See Tillman*, 871 So. 2d at 31.

With insufficient evidence regarding the proximate cause of the ladder's

failure and the existence of a reasonable alternative design, Lowe's summary judgment motion on the AEMLD design defect claim is due to be **GRANTED**. *See Celotex Corp.*, 477 U.S. at 322.  In conclusion, the court reiterates that "[u]nder the AEMLD, a manufacturer has the duty to design and manufacture a product that is reasonably safe for its intended purposes and uses. However, the manufacturer of a product is not an insurer against all harm that might be caused by the use of the product, and the manufacturer or designer is not obligated to produce an accident-proof or injury-proof product." *Verchot v. General Motors Corp.*, 812 So. 2d 296, 301 (Ala. 2001) (citations and quotation marks omitted). The AEMLD is a fault based doctrine, and accordingly, plaintiffs "must prove more than the fact that an injury occurred while [the plaintiff was] using the product . . .  [T]he plaintiff must affirmatively show a defect in the product." *Id.* (citations and quotation marks omitted, first alteration in original).  In the final analysis, while Borum has shown that he suffered severe injuries from his fall, he simply failed to show that he fell because of a defective ladder.  As such, summary judgment is due on his AEMLD claim.

ii.     *Negligent or Wanton Failure to Warn*

The Alabama Supreme Court adopted the Restatement (Second) section for failure to warn.  *See Purvis v. PPG Indus., Inc.*, 502 So. 2d 714, 719 (Ala. 1987). This section provides:

> One who supplies directly or through a third person a chattel for
> another to use is subject to liability to those whom the supplier should

expect to use the chattel with the consent of the other or to be
endangered by its probable use, for physical harm caused by the use
of the chattel in the manner for which and by a person for whose use
it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be
dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is
supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous
condition or of the facts which make it likely to be dangerous.

*Abney*, 919 So. 2d at 293 (quoting Restatement (Second) of Torts § 388).  Put

simply, "[t]he duty to warn end users of the dangers of products arises[] in a pure

negligence context."  *Ex parte Chevron Chemical Co.*, 720 So. 2d 922, 924 (Ala.

1998).  Moreover, "[a] manufacturer is under no duty to warn a user of every

danger which may exist during the use of the product, especially when such

danger is open and obvious."  *Gurley v. Am. Honda Motor Co., Inc.*, 505 So. 2d

358, 361 (Ala. 1987).  Accordingly, "there is no duty to . . . explain the scientific

rationale for each warning, but only a duty to warn of those dangers [for] which

the owner or user would not be aware."  *Id.*  And, where a warning is necessary, it

"need only be one that is reasonable under the circumstances and it need not be the

best possible warning."  *Id.*

    In opposition to summary judgment, Borum asserts that the ladder "should

have contained warnings it had not been tested for stress and twisting and turning

within the ladder frame should be avoided; and fiberglass exposed to high

humidity or sunlight for extended period of time, when the fiberglass is subjected to loading and unloading, can suddenly fail." Doc. 48, at 12. Similarly, Borum also maintains that "[t]here is no warning on this ladder that it should be handled with greater care than aluminum ladders; that it can lose up to 1% of its physical properties per year; that it required a good general maintenance plan; that it had failed a test for continuous loading and unloading; that it would deteriorate in climates of high humidity and exposure to ultraviolet rays; that the weight restriction did not include a factor for stress; that after repeated loading and unloading a person should not twist or turn while on the ladder due to stress." *Id.* at 13-14.

First, as it relates to some of these allegedly defective warnings, Borum fails to offer sufficient evidence that Lowe's breached a duty. *See* doc. 54, at 8. Assuming that the ladder at issue retained unknown dangerous propensities,[11] as a matter of law, the ladder's "Safety Instructions," *see* doc. 21-5, at 2, provided an adequate warning regarding some of these qualities. Lowe's submits the "**FIBERGLASS STEPLADDER AND PLATFORM LADDER SAFETY INSTRUCTIONS**" found on the side of Borum's ladder. *See* doc. 21-5; doc. 21-3, at 39. *See also* doc. 54, at 8. These warnings provide, in relevant part:

**WARNINGS**: Failure to follow all instructions may result in serious

---

[11] The court hesitates to make such an assumption after striking Dr. Toutanji's supplemental expert report. *See supra*. Ultimately, Borum's "creep-rupture" theory—or "endurance time frame" conceptualization, *see* doc. 48-3, at 9—is untimely, and therefore, cannot defeat Lowe's motion for summary judgment.

injury

## INSPECTION

1. Inspect for damaged or missing parts before each use
2. Never use a ladder with missing or damaged parts
3. Check all parts for good condition.  Lightly lubricate moving parts occasionally . . .
5. Destroy ladder if exposed to excessive heat or any corrosive agent

## PROPER SET-UP AND USE

. . . .
4. Ladder is designed to support the weight of one person and material.  Maximum weight not to exceed duty rating of ladder . . .
15. Never walk, bounce, or move ladder while on it . . .
17. **DO NOT OVER-REACH**.  Always keep belt buckle between siderails when climbing or working from ladder.  You may lose your balance and/or tip the ladder
18. Use extreme caution pushing or pulling anything while on a ladder.  You may lose your balance and/or tip the ladder . . . .

## PROPER CARE AND STORAGE

1. Always keep ladder clean of all foreign materials
2. Never store material on ladder
3. Properly support and restrain ladder in transit or storage
4. For additional care, use, and safety instructions, contact your employer, dealer or the manufacturer, or see ANSI A14.5.

Doc. 21-5.  While these warnings may not comport with Borum's exact desired verbiage, they describe and adequately warn of certain "unknown" dangers Borum alleges.  *See Gurley*, 505 So. 2d at 361 ("It is well settled law that in order to make out a prima facie case of negligent failure to give adequate warning, the plaintiff must provide at least a scintilla of evidence that defendant breached a duty.").  The

"Inspection" section warns about potential dangers of substantial exposure to high humidity and/or sunlight.  The "Proper Set-Up and Use" section warns about "twisting and turning" as it cautions against "pushing or pulling."  Moreover, the "Proper Care and Storage" section offers a sufficient warning that the ladder requires "good general maintenance."

Second, as a matter of law, Lowe's retained no duty to warn about the potential loss of physical properties or cyclic horizontal testing.  *See* doc. 48, at 10-11.  To support his assertion of an unknown dangerous condition, Borum cites Werner Co.'s Fiberglass Technical Manual for the ladder at issue.  *See* doc. 48, at 10, 22-23, 27 (citing 48-14, at 2-12).  In relevant part, Werner's Manual provides:

> Ultraviolet light will attack the FRP [Reinforced Plastic Ladders] resin and will definitely influence the aesthetic and to a much lesser degree, the physical and electrical properties . . . . "Fiber bloom" is an aesthetic condition – not a structural one.  Exposed glass fibers do not reflect a loss in physical properties.  Test programs instituted by producers to review structural property loss as a function of time show only small losses of strength.  In programs of 10-15 years duration, loss of 5%-10% in physicals were noted.  These losses cannot be attributed to weathering only.  It has been estimated that the maximum estimated loss in physical properties will approach 1% per year (*and still have an adequate safety factor*).
>
> Cyclic horizontal testing (100,000 cycles) of all composite designs had to date developed different amounts and lengths of cracks.  Often these were along the inside radius between flange and web.  At times horizontal cracks developed within the web.  All these units were incline use tested at 1,000 lbs. *They all carried the load*.

Doc. 48-14, at 4, 8 (emphasis added).  Thus, while Borum points to evidence that

the ladder cannot fully withstand any and all potential conditions, this evidence

offers no support for the proposition that the ladder is *dangerous* because—even

assuming the worst conditions from the testing—the ladder is still a sufficiently

safe product. *Cf. Graham v. Sprout-Waldron and Co.*, 657 So. 2d 868, 870 (Ala.

1995) (reasserting that "manufacturer of a product is not required to produce the

safest possible product, but only to produce a product that is reasonably safe when

put to its intended use.").  In other words, the absence of a warning regarding

these extreme conditions (where the ladder still adequately performed) fails to

make the ladder unreasonably dangerous for its intended use.  Thus, even with the

testing results provided by Werner's Technical Manual, Borum cannot

demonstrate that Lowe's "knows or has reason to know that the chattel is or is

likely to be dangerous for the use for which it is supplied."  *See Abney*, 919 So. 2d

at 293.  Plainly stated, there is no foreseeable risk of harm from this testing.  *See*

*DiBiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 462-63 (Ala.

2008) (holding that foreseeability is generally the key factor in determining

whether a duty exists in a particular circumstance).  Accordingly, Lowe's had no

duty to warn about this testing.  *See Rose v. Miller & Co., Inc.*, 432 So.2d 1237,

1238-39 (Ala. 1983) ("The existence of a legal duty under a given statement of

facts and circumstances is essentially a question of law for the court . . . . It is

elementary that where there is no duty, there can be no negligence.") (citations

omitted).[12]

For these reasons, Lowe's motion for summary judgment regarding Borum's failure to warn claim is due to be **GRANTED**.  *See, e.g.*, *Haney v. Eaton Elec., Inc.*, 528 F. Supp. 2d 1262, 1270 (N.D. Ala. 2007) (granting summary judgment on failure to warn claim for manufacturer of "relays" used to deactivate or deenergize heavy machinery because plaintiff failed to introduce "reliable evidence that the relays in question were imminently dangerous when put to their intended purpose").

### iii.   *Implied Warranty for Fitness of Particular Purpose*

Alabama law imposes an implied warranty that, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods . . . the goods shall be fit for such purpose." Ala. Code § 7-2-315.  Here, however, Borum fails to establish a "particular" purpose for purchasing the ladder or that he relied on Lowe's skill or judgment to select the ladder for that purpose.  First, in opposition to summary judgment, Borum admits that it is "unlikely proof of a particular purpose can be presented at trial."  Doc. 50-1, at 2; doc. 48.  The comments to this Alabama Code section provide, "[a] 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature

---

[12] As there is insufficient evidence of negligence for Borum's failure to warn claim, there is also insufficient evidence of wanton behavior by Lowe's.

of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." Ala. Code § 7-2-315, comment 2. In other words, Borum cannot demonstrate that he purchased the ladder for a peculiar, as opposed to ordinary, purpose.

Moreover, there is no evidence that Borum relied on a Lowe's agent to select the specific ladder model at issue. In fact, Borum barely recalls even buying the ladder at Lowe's, much less relying on the "seller's skill or judgment" to purchase the ladder. *See* doc. 21-3, at 15; doc. 48-6, at 3. And indeed, this implied warranty is only "intended to cover the sale of goods where the buyer relies on the seller's expertise to provide appropriate goods." *Montgomery Rubber and Gasket Co., Inc. v. Belmont Machinery Co., Inc.*, 308 F. Supp. 2d 1293, 1303 (M.D. Ala. 2004). *See also Donald v. City Nat'l Bank of Dothan*, 329 So. 2d 92, 96 (Ala. 1976) (finding summary judgment appropriate on implied warranty for particular purpose claim where plaintiff offered "no evidence to show that the bank possessed any skill or knowledge upon which he could have relied"). Absent any proof of this implied warranty's *prima facie* elements, summary judgment is also warranted on this claim.

## IV.   CONCLUSION

For the aforementioned reasons, by separate order the court will **GRANT** Defendants' summary judgment motions, *Daubert* motion, and motion to strike Dr. Toutanji's supplemental expert report, and will **DENY** Borum's motion to

amend his original complaint.

**DONE** the 6th day of June, 2012.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE